UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SADIE PINNOCK,                          :
Individually and as Executor
of the Estate of Lakeia Dunkley,        :

          Plaintiff,                    :

          vs.                           :    No. 3:05cv927(WIG)

CITY OF NEW HAVEN,                      :
NICOLE NATALE,
CARLOS ROMAN,                           :

          Defendants.                   :

----------------------------------X

**RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff, Sadie Pinnock, individually and as executor of
the estate of Lakeia Dunkley, has brought this wrongful death
action against the City of New Haven and Police Officers Nicole
Natale and Carlos Roman, seeking redress under 42 U.S.C. § 1983
for Defendants' alleged violation of the Decedent's Fourth
Amendment right to be free from unreasonable searches and
seizures, and also asserting state-law claims for false
imprisonment, battery, and violation of Connecticut's wrongful
death statute, Conn. Gen. Stat. § 52-555.  The City of New Haven
and Officer Roman have moved for summary judgment on all counts
of Plaintiff's complaint [Doc. # 43].  Defendant Natale has also
moved for summary judgment on all claims [Doc. # 39].  For the
reasons set forth below, summary judgment is granted in favor of
the City of New Haven.  The motions for summary judgment of

Officers Roman and Natale are granted in part and denied in part.

## Summary Judgment Standard

A moving party is entitled summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. The burden of establishing that there are no issues of material fact lies with the moving party. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). A "movant for summary judgment 'always bears' the burden of production or 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.'" *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c) (repealed 2007))).

After the movant has made a prima facie showing of the lack of a genuine issue of material fact, the burden then switches to non-moving party to demonstrate a genuine issue for trial through the identification of specific facts, supported by sufficient concrete, probative evidence, to allow a rational trier of fact

to find in its favor.  *Celotex*, 477 U.S. at 323.  When a motion

for summary judgment is properly made and supported, an opposing

party may not rely merely on allegations or denials in its own

pleading; rather, its response must – by affidavits or as

otherwise provided in Rule 56 – set out specific facts showing a

genuine issue for trial.  If the opposing party does not so

respond, summary judgment should, if appropriate, be entered

against that party.  Rule 56(e)(2), Fed. R. Civ. P.; *see Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Lujan v.

Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

In ruling on a summary judgment motion, this Court cannot

resolve issues of fact.  Rather, it is empowered to determine

only whether there are material issues in dispute to be decided

by the trier of fact.  The substantive law governing the

controversy identifies those facts that are material.  *Anderson*,

477 U.S. at 248.  A court deciding a motion for summary judgment

views the evidence in the light most favorable to the party

opposing summary judgment, and draws all reasonable inferences in

the non-moving party's favor.  *Amnesty Am. v. Town of W.

Hartford,* 361 F.3d 113, 122 (2d Cir. 2004).  The court is not

concerned with whether "the evidence unmistakably favors one side

or the other, but whether a fair-minded jury could return a

verdict for the [non-movant] on the evidence presented."  *Readco,

Inc. v. Marine Midland Bank,* 81 F.3d 295, 298 (2d Cir. 1996)

(alteration in original).

## Factual Background

The following facts are undisputed unless indicated otherwise.[1]

The events giving rise to this action occurred on the evening of March 1, 2005, in the City of New Haven.  On the evening in question, Officers Roman and Natale, both City of New Haven police officers, were on duty and were assigned to the Street Interdiction Detail ("SID").[2]  Officers Roman and Natale were not in uniform, but were wearing blue sweatshirts with yellow lettering that identified them as New Haven police officers, and both had their police badges hanging from chains

---

[1] Defendants City of New Haven and Roman have filed a Local Rule 56(a)1 Statement setting forth each material fact as to which they contend there is no genuine issue to be tried. Accompanying this Statement are the sworn affidavit of Defendant Roman; excerpts from the deposition transcripts of Andy Leng, a witness to the incident, and Plaintiff's expert, Duc V. Duong; excerpts from the signed statement of Ronshemu Pittman, the passenger in Ms. Dunkley's car; and the autopsy report and death certificate for the Decedent prepared by Malka B. Shah, M.D., of the State Office of the Chief Medical Examiner (Defs.' Ex. 1, 2, 7, 3, 5, 6).  Defendant Natale has filed a sworn affidavit setting forth her version of the facts.  Plaintiff has responded with a Local Rule 56(a)2 Statement in opposition to Defendants' Motions for Summary Judgment, and a Local Rule 56(a)1 Statement, setting forth disputed issues of material fact.  Accompanying these Statements are a signed statement by Mr. Pittman taken by the New Haven Police Department (Pl.'s Ex. A) and police reports prepared by Officer Roman, Officer Natale, Detective Stephen Cappola, and Detective Amanda Coppola (Pl.'s Ex. B).

[2] Officer Roman describes the SID detail as concerned with quality of life crimes including, but not limited to, narcotics, weapons, noise complaints, and loitering.  (Roman Aff. ¶ 5.)

around their necks.  Officer Roman was driving an unmarked New Haven police car, with Officer Natale riding in the front seat. The unmarked police car did not have a siren or flashing lights, but it did have an exterior spotlight on the driver's side.

At approximately 7:35 p.m., Officers Roman and Natale were traveling in the unmarked police car on Day Street, immediately behind a car driven by Lakeia Dunkley with Ronshemu Pittman as a passenger in the front seat.  Ms. Dunkley turned left from Day Street onto Chapel Street while the overhead traffic light was red.  Officers Roman and Natale followed her and tried unsuccessfully to get her to stop by illuminating her vehicle with the police car's spotlight and flashing the high beams. After approximately two blocks, Officer Roman was able to pull along side of Ms. Dunkley's vehicle.  Officer Natale identified herself and Officer Roman as police officers and requested that Ms. Dunkley pull over.  Ms. Dunkley complied and pulled over at the corner of Chapel Street and Sherman Avenue.  Officer Roman parked behind and to the left of Ms. Dunkley's car and placed a radio call for a marked New Haven police vehicle to assist, since this was a stop for a traffic violation.  Officers Roman and Natale exited the police vehicle and approached Ms. Dunkley's vehicle, Officer Roman on the driver's side and Officer Natale on the passenger's side.

Officer Roman states that, once at the vehicle, he informed

Ms. Dunkley of the reason for the stop and asked her for her driver's license, vehicle registration, and insurance information. Ms. Dunkley was upset and inquired again why she had been stopped, to which Officer Roman responded that she had made an improper left turn while the traffic light was red and that he had been following right behind her. According to Officer Roman, Ms. Dunkley then became agitated and very argumentative.[3] Ms. Dunkley complained that this was not right and was harassment. She provided her license but was unable to locate her vehicle registration or insurance information and continued to argue with Officer Roman.

Officer Roman then asked the passenger for his name. The passenger responded that he was Ronshemu Pittman. Ms. Dunkley became more even more irate, yelling at Officer Roman and continuing to claim police harassment. He again asked for Ms. Dunkley's vehicle documents, but she did not provide them.

Officer Roman states that he was concerned about Ms. Dunkley's evasiveness and, at that point, asked Ms. Dunkley to remove the car keys from the ignition and to exit the vehicle "for officer safety reasons." (Roman Aff. ¶ 18.) Ms. Dunkley gave him her keys, which he placed on the vehicle roof. Upon

---

[3] Plaintiff disagrees with this characterization of Ms. Dunkley's conduct. However, both police officers described similar conduct and, as discussed below, Mr. Pittman confirmed in his statement that Ms. Dunkley was upset about why she had been stopped and why she was frisked. The Court finds that the evidence of record supports this description of her behavior.

exiting the vehicle, Ms. Dunkley grabbed the keys and threw them onto the driver's seat.

Officer Natale asked Mr. Pittman to exit the vehicle also, and "for officer safety" Officer Natale conducted an outer garment pat down of Mr. Pittman and then of Ms. Dunkley, while Officer Roman proceeded to the police car to start the legal forms documenting the traffic violation.  (Pl.'s Ex. B, Roman Police Report at 2.)  At this point, some other officers from SID arrived on the scene, but most left as soon as they became aware that this was just a traffic stop.

Ms. Dunkley continued to yell profanities at the officers and yelled that she did not want all of these people watching her.  Mr. Pittman told her to calm down, stating that she was getting "too hyper."  *Id.*

As Officer Roman was sitting in the unmarked police car preparing the ticket, he learned that Ms. Dunkley's driver's license had been suspended.  As he was preparing to confront Ms. Dunkley with this information, he became aware that she was no longer standing.  He learned from another officer that she was on the ground.  Officer Roman immediately exited the police car and located Ms. Dunkley.

Another officer on the scene, Officer Terrence McNeil, had already called for emergency medical assistance.  The paramedics and an ambulance arrived at the scene.  Officer Roman was informed that Ms. Dunkley was not breathing.  Upon orders from a

superior officer, he followed the ambulance to the Hospital of St. Raphael.  Efforts to revive Ms. Dunkley were unsuccessful, and Dr. Paul Russo pronounced her dead at 8:40 p.m.  Pursuant to orders from a superior officer, Officer Roman then notified the Bureau of Identification of the death.

Officer Roman never conducted a search of the person of Ms. Dunkley or of the motor vehicle that she had been operating. Officer Roman never ordered an autopsy to be performed.

Officer Natale's report confirms that after Ms. Dunkley exited her vehicle, she continued to yell and swear at the officers that they were harassing her and had no reason to stop her, and that Mr. Pittman tried to get her to calm down.  Officer Natale stated that Ms. Dunkley would calm down for a minute and then would begin yelling and swearing again.  In her affidavit, Officer Natale states that she conducted the outer garment pat down of Ms. Dunkley "for her [Officer Natale's] safety."  (Natale Aff. ¶ 14.)  Officer Roman then asked Officer Natale to have Ms. Dunkley make a further effort to locate her vehicle registration and insurance information so that she would not be charged with additional motor vehicle offenses.  Officer Natale asked Ms. Dunkley to attempt to locate the paperwork via the passenger's side door for her safety to avoid the traffic on Chapel Street. Officer Natale was standing towards the rear of the vehicle.  As Ms. Dunkley was looking through her car's glove compartment, she continued to yell and swear and then began to cry.  Mr. Pittman

told her to calm down. Approximately one to two minutes later, she fell to her knees and then onto her left side, and appeared to be having a seizure. *Id.* at ¶¶ 14-18. Officer Natale attempted to keep her still to avoid further injury and immediately requested Officer McNeil, who had arrived at the scene, to advise Dispatch and request medical assistance via the radio. Personnel from the New Haven Fire Department and American Medical Response ("AMR") arrived shortly thereafter. Ms. Dunkley was transported by AMR to the Hospital of St. Raphael. *Id.* at ¶¶ 19-20.

Mr. Pittman gave a statement to the police later that night. He stated that after the police officers stopped them, they told him to get out of the car, and they "checked [him] down." (Pl.'s Ex. A, Pittman St. at 9.) Then the officers told Ms. Dunkley to get out of the car and they "frisk[ed] her down." *Id.* He complied, and there was no verbal or physical confrontations between him and the police officers. *Id.* He described Ms. Dunkley as upset about why she had been stopped and "why she got out, got out of the car, why she being frisked." *Id.* at 10. He stated that they were both patted down for weapons and drugs. *Id.* The pat-downs were performed at the back of the vehicle by a female officer, whom he identified as Officer Natale. *Id.* Officer Natale then walked with Ms. Dunkley to the passenger side of the car and asked her to look for her registration and insurance information in the glove compartment. Mr. Pittman

stated that he was looking at the officers, then he turned his head, turned back to look at them, and he saw Ms. Dunkley on the ground. *Id.* at 9. He said a "couple of seconds, like ten, eleven seconds" lapsed from the time Ms. Dunkley got to the passenger side of the car and when she passed out. *Id.* at 11. He confirmed that there was never a physical confrontation between Ms. Dunkley and Officer Natale, "no fighting, no nothing." *Id.* at 12.

Mr. Andy Leng, a security guard, who was watching from inside a building approximately 25 to 30 yards from the scene, witnessed some of the events in question, although he could not hear anything that was being said. In his deposition, Mr. Leng testified that he saw the police officers walk up to the car while the female driver was still in the car. When she got out of the car, she was "waving her hands in the air." (Defs.' Ex. 2, Leng Depo. at 18.) She walked toward the trunk of the car, where she was patted down by one of the police officers. He estimated that the pat-down lasted a matter of seconds. He turned his attention away from the window until he heard sirens, which was about a minute later.

An autopsy on the body of Ms. Dunkley was performed by order of the State Chief Medical Examiner pursuant to Connecticut General Statutes § 19a-406. Dr. Malka B. Shah M.D. of the Office of the Chief Medical Examiner, who performed the autopsy, determined that Ms Dunkley's cause of death was a "ruptured berry

aneurysm," and the manner of death was "natural." Dr. Shah noted the same cause and manner of death on the death certificate.

Plaintiff's expert, Dr. Duc V. Duong, M.D., did not necessarily disagree with the findings of Dr. Shah, but had some questions as to how the findings were characterized. Dr. Duong performed his own autopsy on the body of Ms. Dunkley, and found no evidence of trauma. Dr. Duong could not determine within a reasonable degree of medical certainty her cause of death. He testified that there was a rupture, there was bleeding, but he did not know the cause of the rupture. (Dr. Duong Depo. at 70-71.)

## **Discussion**

Defendants have moved for summary judgment pursuant to Rule 56, Fed. R. Civ. P., on the grounds that there are no genuine issues of material fact in dispute and that Plaintiff cannot succeed on her federal and state-law claims as matter of law. Officers Roman and Natale have also asserted as affirmative defenses that they are entitled to qualified immunity on Plaintiff's § 1983 claim, that any common-law claims are barred by the doctrine of governmental immunity, and that they were acting in good faith in their capacities as police officers and exercised only reasonable and necessary means to carry out their duties. The City of New Haven[4] asserts that Plaintiff has failed

---

[4] The only claim against the City is that it was "deliberately indifferent in the supervision, training,

to set forth a cognizable state or federal claim as to which relief may be granted against the City.

## I. Wrongful Death Claim - Conn. Gen. Stat. § 52-555

Plaintiff's first cause of action is brought pursuant to Connecticut's wrongful death statute, Conn. Gen. Stat. § 52-555, entitled "Actions for injuries resulting in death."   This statute allows an executor to recover "from the party legally at fault for such injuries just damages together with the costs of reasonably necessary medical, hospital and nursing services, and including funeral expenses." Conn. Gen. Stat. § 52-555(a).   In order to prevail against a defendant, a plaintiff much prove not only a violation of a standard of care as a wrongful act, but also a causal relationship between the injury and the resulting death. *Grody v. Tulin*, 170 Conn. 443, 448 (1976); *Bates v. Carroll*, 99 Conn. 677 (1923); *Holeman v. City of New London*, 330 F. Supp. 2d 99, 119 (D. Conn. 2004), *rev'd in part on other grounds,* 425 F.3d 184 (2d Cir. 2005).   "A causal relation between the defendant's wrongful conduct and the plaintiff's injuries is a fundamental element without which a plaintiff has no case." *Lombardi v. J.A. Bergren Dairy Farms, Inc.*, 153 Conn. 19, 22 (1965).   "If the chain of causation of the damage, when traced from the beginning to the end, includes an act or omission which,

---

investigation and discipline of the individual defendants, thus ratifying, promulgating and approving the constitutional violations."  (Compl. ¶ 9.)

even if wrongful or negligent, is or becomes of no consequence in the results or so trivial as to be a mere incident of the operating cause, it is not such a factor as will impose liability for those results." *Grody*, 170 Conn. at 448-49 (quoting *Connellan v. Coffey*, 122 Conn. 136, 142 (1936)); *see also Ward v. Greene*, 267 Conn. 539, 546-47 (2004).

The autopsy performed by Dr. Shah showed that the cause of death was a spontaneous rupture of a berry aneuryism,[5] and the manner of death was "natural." (Defs.' Ex. 5 at 5.) While Plaintiff's expert, Dr. Duong, disagreed with Dr. Shah's opinion as to the cause of death,[6] he testified that he did not have an opinion within a reasonable degree of medical probability as to the cause of Ms. Dunkley's death. (Duong Depo. at 68.) He questioned the Medical Examiner's conclusion as to the cause of the bleeding, but he repeatedly stated that he could not offer an opinion as to the cause. *Id.* at 67-70. "I know there bleeding there. What was the cause of rupture, I don't know. I cannot –

_____

[5] A "berry aneurysm" is a small sac formed by the dilation of the wall of an artery (an aneurysm) that looks like a berry and classically occurs at the point at which a cerebral artery departs from the circular artery (the circle of Willis) at the base of the brain. *Dorland's Illustrated Medical Dictionary* at 76 (28th ed. 1994).

[6] He testified that the reasons for his disagreement were that berry aneurysms are not typically found in patients as young as Ms. Dunkley, who was 20; the aneurysm was small, whereas ruptures most often occur with larger aneurysms; and the posterior location of the aneurysm, whereas the most common place for aneurysms is the anterior portion of the blood vessel. (Duong Depo. at 66-69.)

I cannot say." *Id.* at 70. "I cannot say what happened in this case." *Id.* "In this case, I cannot come to the cause of death." *Id.* at 71. He did confirm, however, that there was no evidence of trauma to the body. *Id.* at 72. Additionally, Mr. Pittman confirmed that there was no physical altercation between the officer and Ms. Dunkley.

Plaintiff has produced no evidence that creates a genuine issue of material fact as to whether the conduct of any of the Defendants was a proximate cause of the Decedent's death.[7] While the question of proximate causation generally belongs to the trier of fact because causation is essentially a factual issue, *Label Systems Corp. v. Aghamohammadi*, 270 Conn. 291, 321-22 (2004)*,* here, there has been no evidence presented from which a fair and reasonable jury could conclude that the conduct of either Defendant in stopping the Decedent's vehicle for a traffic violation, having her exit the car, and performing a very brief outer garment pat-down was a proximate cause of the bleeding that resulted in her death. The Court finds that Plaintiff has failed to carry her burden in this regard and grants summary judgment in favor of all Defendants on Count One of Plaintiff's Complaint.

II. § 1983 – Fourth Amendment Violation

Plaintiff's second count is brought pursuant to 42 U.S.C. § 1983 for Defendants' alleged violation of the Decedent's Fourth

---

[7] Indeed, Plaintiff has not opposed Defendants' motions for summary judgment on this cause of action.

Amendment rights.  Plaintiff alleges that Defendants, who were

acting under color of State law, subjected the Decedent to an

unlawful search and seizure in violation of the Fourth Amendment

in that they lacked probable cause to search the Decedent and her

vehicle,[8] and that their detention and search of Decedent and her

passenger for the alleged offense of running a red light was

unreasonable.  Defendants have moved for summary judgment on the

grounds that their conduct did not violate the Fourth Amendment

as a matter of law and that they are entitled to qualified

immunity.  Plaintiff responds that there are substantial issues

of fact regarding the pat-down search of the Decedent by

undercover narcotics officers for a mere traffic violation.[9]

   Qualified immunity protects officials from liability for

---

[8]  There is no evidence that the Decedent's vehicle was
searched and Plaintiff seems to have abandoned that claim.  In
her opposition to the summary judgment motions, she argues only
that the pat-down search of the Decedent was unreasonable.

[9]  Neither Defendants nor Plaintiff draw a distinction
between the actions of Officer Roman and Officer Natale for
purposes of the section 1983 claim, and in the Court's view, no
legal distinction should be drawn.  While the personal
involvement of an officer in the conduct that allegedly violates
a plaintiff's constitutional rights is a prerequisite to
liability under section 1983, *Snider v. Dylag*, 188 F.3d 51, 54
(2d Cir. 1999), here both officers were involved in stopping the
vehicle and in having the occupants exit the vehicle.  Although
Officer Roman did not perform the pat-down of either Ms. Dunkley
or Mr. Pittman, he knew that Officer Natale was performing the
pat-downs and was in a position to intercede to stop them.  He
may have even ordered the pat-down of the Decedent, although this
is not clearly set forth in any of the affidavits.  *See Gombart
v. Lynch,* — F. Supp. 2d —, 2008 WL 818800 (D. Conn. Mar. 27,
2008).  The fact that Officer Natale is female was undoubtedly a
factor in who performed the pat-down of Ms. Dunkley.

civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is "clearly established" if "the contours of the right are sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007) (quoting *Anderson v. Creighton*, 482 U.S. 635, 640 (1987)) (internal quotation marks and alterations omitted).

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court set forth a two-part test to determine if a defendant is entitled to qualified immunity. First, the court must find that the facts viewed in the light most favorable to the plaintiff show that the official's conduct violated a constitutional right. If the facts viewed in this light do not establish a constitutional violation, there is no need to inquire further, and the officer is entitled to summary judgment on that claim. *Gilles*, 511 F.3d at 244. If, however, a violation of a constitutional right could be shown, the court must then determine whether the right violated was clearly established at the time of the defendant's actions. *Saucier,* 533 U.S. at 201; *see Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007). This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201. "The contours of the right must be

sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson*, 483 U.S. at 640; *see also Saucier,* 533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.") The formulation of this test serves the underlying purpose of qualified immunity.  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity would be appropriate." *Saucier*, 533 U.S. at 202*.*

Thus, the Court begins its analysis with whether the officers' conduct violated the Decedent's Fourth Amendment rights when the facts are viewed in the light most favorable to Plaintiff.  The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  A motor vehicle stop and temporary detention made by a police officer is a seizure under the Fourth Amendment, and as such must be reasonable.  *Whren v. United States*, 517 U.S. 806, 809, 810 (1996).  In general, a motor vehicle stop is reasonable where the officer making the stop has probable cause to believe that a traffic violation has occurred.  *Id.* at 810.  Visual observation of a traffic violation by a police officer, as in this case,

satisfies the requirement for probable cause.

Once a vehicle is lawfully detained for a traffic stop, police officers may order the driver to get out of the car without violating the Fourth Amendment. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (per curiam) (recognizing the inordinate risk confronting an officer as he approaches a person seated in an automobile). The Supreme Court extended the rule of *Mimms* to passengers of lawfully stopped vehicles in *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). The Court noted that a police officer's safety is significantly impaired while a police officer is making a motor vehicle stop and that the presence of a passenger generally increases the risk to an officer's safety. *Id.* at 414.

In response to Ms. Dunkley's argumentative behavior, and her inability to produce her vehicle registration or insurance documentation, Officers Roman and Natale asked both Ms. Dunkley and Mr. Pittman to exit the vehicle. As *Mimms* and *Wilson* hold, Ms. Dunkley's Fourth Amendment rights were not violated by Officer Roman's asking her to exit the vehicle.[10] *See Mimms*, 434 U.S. at 110; *Wilson* 519 U.S. at 414; *see also Holeman v. City of*

---

[10] Although the record is not clear as to whether Ms. Dunkley or Mr. Pittman was asked to leave the vehicle first, for purposes of this motion, the Court accepts Plaintiff's position that Mr. Pittman was asked to exit the vehicle first. Nevertheless, under the law of *Mimms* and *Wilson,* Officers Roman and Natale were justified under the Fourth Amendment in asking both to exit the vehicle. *See Mimms*, 434 U.S. at 110; *Wilson*, 519 U.S. at 415.

*New London*, 425 F.3d 184, 192 (2d Cir. 2005).

Having established that Ms. Dunkley's Fourth Amendment rights were not violated by either the lawful stop of her vehicle for a traffic violation or Officer Roman's asking her to exit the vehicle, the Court turns now to the question of whether the brief pat-down and detention of Ms. Dunkley violated her rights under the Fourth Amendment. "The temporary detention of a person when the police have stopped her vehicle, regardless of its brevity or limited intrusiveness, constitutes a seizure for Fourth Amendment purposes, and thus must not be unreasonable." *Gilles*, 511 F.3d at 244-45. An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Id.* "Similarly, the investigative means employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time." *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)).

The Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 27 (1968), held that when a police believes he is dealing with an armed and dangerous individual, he may perform a reasonable search for weapons. A police officer is not required to take unnecessary risks in the performance of his duties, and may take steps to determine whether the individual is in fact armed. *Id*. at 23-24. The determination of whether an officer acted reasonably in searching for weapons must be informed by the "specific

reasonable inferences which he is entitled to draw from the facts in light of his experience" and not "his inchoate and unparticularized suspicion or 'hunch'[.]" *Id*. at 27. The Court in *Terry* held that "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id*.; *see also Michigan v. Long*, 463 U.S. 1032, 1049 (1983). The reasonableness of a police officer's search is determined by the "totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 37 (1996); *see also Holeman*, 425 F.3d at 192. The Supreme Court has "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the inquiry." *Ohio v. Robinette*, 519 U.S. at 37.

Thus, "[u]nder *Terry*, to determine whether police officers were justified in frisking a temporarily detained person to see if he is carrying weapons, [the court applies] an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant [an officer] of reasonable caution in the belief that the action taken was appropriate?" *United States v. Rahman*, 189 F.3d 88, 120 (2d Cir. 1999) (quoting *Terry*, 392 U.S. at 21-22) (internal quotation marks omitted). The officer need not be absolutely certain that the individual is armed before carrying out a stop and frisk for weapons. Rather,

the issue is whether a reasonably prudent officer under the circumstances would be warranted in believing that his safety or that of others was in danger. *Id.*

Viewing the totality of the circumstances in the light most favorable to Plaintiff, the only evidence that could support a reasonably prudent officer's belief that either Ms. Dunkley or Mr. Pittman posed a danger to him or her was Ms. Dunkley's argumentativeness and swearing at the officers and her throwing the car keys back onto the driver's seat after Officer Roman placed them on the top of the car. There is no evidence to suggest that either was armed. Significantly, neither officer testified that he or she believed Ms. Dunkley or Mr. Pittman was armed or dangerous. They testified in the most general and conclusory of terms that the pat-downs were performed for "officer safety." This statement, standing alone, does not constitute "specific and articulable facts" available to the officers at the time to establish a reasonable belief that Ms. Dunkley posed a threat to officer safety. *See Terry*, 392 U.S. at 21.

Clearly, under certain circumstances, the manner in which a person acts, when confronted by police officers, can be grounds for raising a reasonable suspicion to warrant a limited search, such as a pat-down. *Phaneuf v. Fraikin,* 448 F.3d 591, 599 (2d Cir. 2006); *see also United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (holding that "evasive flight" among other factors

justified a *Terry* stop and frisk); *United States v. Welbeck*, 145 F.3d 493 (2d Cir.) (warrantless search of bag was valid where officers had reasonable suspicion to detain defendant based on his furtive communications and evasive behavior), *cert. denied*, 525 U.S. 892 (1998). Here, Ms. Dunkley was swearing and being argumentative and threw the keys back into the car. Whether that conduct was such as to raise a reasonable suspicion that she was armed or dangerous is a factual issue that cannot be resolved on summary judgment based upon the evidence of record. This is not a case where the officers had received a tip that either Ms. Dunkley or Mr. Pittman was armed. *See United States v. Muhammad*, 463 F.3d 115 (2d Cir. 2006); *United States v. Suggs*, 14 Fed. Appx. 54 (2d Cir.), *cert. denied,* 534 U.S. 1033 (2001). There is no evidence that the stop occurred in a high crime area, or that the officers had been informed that a crime had just been committed. *See United States v. Alexander*, 907 F.2d 269 (2d Cir. 1990). There is no evidence that either officer observed anything, such as a bulge in the suspect's clothing, which might be represent a concealed weapon, *see United States v. Lucas*, 68 Fed. Appx. 265 (2d Cir.), *cert. denied,* 540 U.S. 1024 (2003); *United States v. Manuel*, 64 Fed. Appx. 823 (2d Cir. 2003); *United States v. Hamilton*, 978 F.2d 783 (2d Cir. 1992); or that either Ms. Dunkley or Mr. Pittman made any furtive movements as if reaching for a gun. *See United States v. Bowden*, 45 Fed. Appx. 61 (2d Cir. 2002). Additionally, Plaintiff points out that Mr.

Pittman was the first searched, despite the fact that he was not the one being argumentative with the police, and no weapons or drugs were found on his person.

While the Court appreciates the danger to officers presented by any *Terry* stop, the Court concludes, after viewing the totality of the evidence in the light most favorable to Plaintiff, that genuine issues of material fact exist as to whether an officer could reasonably believe that Ms. Dunkley was armed or dangerous so as to justify the pat-down. Thus, the Court denies Defendants' motions for summary judgment on Plaintiff's § 1983 claim for violation of the Decedent's Fourth Amendment rights.

Having found genuine issues of material fact as to whether Defendants' conduct violated the Decedent's Fourth Amendment rights, the Court now turns to the second prong of the qualified immunity test that is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Walczyk*, 496 F.3d at 154; *see also Oliveira v. Mayer*, 23 F.3d 642, 648-49 (2d Cir. 1994)(noting that the inquiry into the lawfulness of the defendant's action is not the same as the inquiry into qualified immunity), *cert. denied*, 513 U.S. 1076 (1995). "If the right at issue was not clearly established by then existing precedent, then qualified immunity shields the defendant. Even if the right at issue was clearly established in certain respects, however, an officer is still entitled to

qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Walczyk,* 496 F.3d at 154 (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

Although the issue of qualified immunity should be decided by the Court as a matter of law, that is true only when the facts concerning the availability of the defense are undisputed; otherwise, jury resolution is normally required. *Oliveira,* 23 F.3d at 649. If any reasonable trier of fact could find that the defendant's actions were objectively unreasonable, then the defendant is not entitled to summary judgment. *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995).

In March of 2005, it was clearly established law that an officer could perform a limited pat-down for weapons if he had a reasonable belief that the suspect was armed or dangerous. *Terry,* 392 U.S. 1 (1968). Whether it was objectively reasonably for Defendants to believe that they were not violating the Decedent's rights by performing a pat-down under the circumstances here presented is a more difficult question.

In resolving the qualified immunity issue, the Court looks at the evidence in the light most favorable to the police officers and asks whether "a jury could reasonably conclude that it was objectively reasonable for the defendants to have believed that their [pat-down of the Decedent] was lawful." *Oliveira*, 23 F.3d at 649. As noted above, Officers Roman and Natale have

never stated that they believed Ms. Dunkley was armed an there is

no evidence to support a reasonable suspicion that she was armed.

However, when the totality of the evidence is viewed in the light

most favorable to Defendants, the Court finds genuine issues of

material fact to be decided by a jury as to whether it was

objectively reasonable for Defendants to conclude that Ms.

Dunkley posed a danger to them or others based upon her conduct

at the scene, so as to warrant a pat-down for weapons in

connection with this traffic stop.  Therefore, the Court must

deny summary judgment on Defendants' qualified immunity defense.

### III.  False Imprisonment

Plaintiff's third count is a common-law state claim for

false imprisonment.  She alleges that Defendants caused the

Decedent's physical liberty to be restrained against her will.

False imprisonment is the "unlawful restraint by one person

of the physical liberty of another." *Green v. Donroe*, 186 Conn.

265, 267 (1982).  It is an intentional tort, and any period of

restraint, no matter how brief in duration, is sufficient to

constitute a basis for liability.  *Id.*  Additionally, the

detention must be wholly unlawful.  *LoSacco v. Young,* 20 Conn.

App. 6, 19, *cert. denied*, 213 Conn. 808 (1989).  Here,

Defendants' stop of the Decedent's vehicle and their brief

detention of Decedent was based upon probable cause that a

traffic violation had occurred.  As such, their detention of the

Decedent was not wholly unlawful, and they cannot be liable for

false imprisonment.  *Smith v. City of New Haven,* 166 F. Supp. 2d
636, 644 (D. Conn. 2001).  Accordingly, the Court grants summary
judgment in favor of Defendants on this count.

IV.  Battery

The last count asserted against Defendants is for common-law
battery.  Plaintiff alleges that in patting down the body of the
Decedent at the back of her vehicle and in ordering that an
autopsy be performed without the consent of the Decedent's
family, they subjected her to a battery.

Under Connecticut law, "[a]n assault has been defined as any
attempt with force or violence to do corporeal offence to another
coupled with the apparent ability to complete the act ...
Connecticut ... [however], ... has discarded the classical
definition of an assault and the word assault is often used when
in truth 'battery' would be more accurate." D. Wright, J.
Fitzgerald and W. Ankerman, *Connecticut Law of Torts* § 6 at 8 (3d
ed. 1991), Section 6, p. 8. "A battery is a completed assault.
Battery has been defined as any touching of the person in
rudeness or in anger ." *Id.* at 10.

As to Plaintiff's claim that Defendants are liable for
committing a battery by ordering an autopsy of the Decedent
without first obtaining her family's consent, there is no
evidence that either of the Defendants ordered the autopsy or had
any involvement in the decision to have an autopsy performed.
Rather, the autopsy was performed on orders of the Office of the

Chief Medical Examiner of the State of Connecticut pursuant to
Conn. Gen. Stat. § 19a-406(a). By law, the Chief Medical
Examiner is required to investigate all human deaths which are
"sudden and unexpected," Conn. Gen. Stat. § 19a-406(a)(2). The
statute further provides that, in such cases, the Chief Medical
Examiner may require an autopsy "when it appears warranted for
proper investigation." Conn. Gen. Stat. § 19a-406(a).
Defendants are entitled to summary judgment on this aspect of
Plaintiff's battery claim as a matter of law.

As to Plaintiff's claim for battery against Officer Roman
with respect to the pat-down of the Decedent, the Court holds
that Officer Roman is entitled to summary judgment as there is no
evidence that he performed the pat-down or that he had any
physical contact with the Decedent.[11]

As to Plaintiff's claim for battery against Officer Natale,
who did in fact perform an outer garment pat-down of the
Decedent, which Plaintiff admits lasted "a matter of seconds,"
(Pl.'s Local Rule 56(a)2 Response to Defs.' ¶ 14), the Court
finds that Officer Natale is entitled to qualified immunity from
this common-law state tort claim for the performance of a

---

[11] Alternatively, the Court finds that Officer Roman is
entitled to state-law qualified immunity for the performance of
discretionary governmental acts. *See* Discussion *infra* as to
Defendant Natale.

discretionary[12] governmental act.  *See Mulligan v. Rioux*, 229
Conn. 716, 727 (1994).  Under Connecticut law, "[a] municipal
employee is liable for the misperformance of ministerial acts,
but has a qualified immunity in the performance of governmental
acts."  *Id.*  A municipal employee's immunity for the performance
of discretionary governmental acts is qualified by three
recognized exceptions: (1) where the circumstances make it
apparent to the officer that his or her failure to act would be
likely to subject an identifiable person to imminent harm; (2)
where a statute specifically provides for a cause of action
against a municipality or municipal official for failure to
enforce certain laws; and (3) where the alleged acts involve
malice, wantonness, or intent to injure, rather than negligence.
*Id.* at 728 (citing *Evon v. Andrews*, 211 Conn. 501, 505 (1989)).
State qualified immunity that protects municipal employees from
common-law tort liability for the performance of discretionary
governmental acts is different than federal-law qualified
immunity, discussed above, that protects officials from suits
under § 1983, and which hinges on the objective reasonableness
standard.  *Id.*  So long as the act is discretionary in nature,
as opposed to ministerial, the municipal employee is entitled to

---

[12]  This state-law immunity does not apply to the
performance of ministerial duties, which refers to acts performed
in a prescribed manner without the exercise of discretion or
judgment.  *Mulligan*, 229 Conn. at 727 (quoting *Wright v. Brown*,
167 Conn. 464, 471 (1975)).

qualified immunity from common-law tort claims unless the plaintiff can qualify for one of the three exceptions set forth above. *Id.* at 731.

Here, Officer Natale's pat-down of Ms. Dunkley was clearly a discretionary act, since it involved the exercise of judgment or discretion. *See, e.g., Castorina v. Stewart,* No. CV 950324487, 1998 WL 309393, at *6 (Conn. Super. June 3, 1998) (finding an officer's actions in arresting an individual were discretionary as a matter of law). There is nothing in the record to indicate that Officer Natale acted with malice, wantonness, or with intent to injure. Nor is there any evidence that an identifiable person faced imminent harm unless she acted. And, there is no statute that provides for a cause of action for failure to act. Thus, the Court finds that Officer Natale enjoys state-law qualified immunity for the performance of a discretionary governmental act. Accordingly, the Court will grant summary judgment in favor of Defendants on the fourth count of Plaintiff's complaint.

## V.  Municipal Liability

Under *Monell v. New York City Department of Social Services,* 436 U.S. 658 (1978), a municipality "may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees. In order to impose § 1983 liability upon a municipality, a plaintiff must demonstrate that any constitutional harm suffered was the result of a municipal policy

or custom." *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 870 (2d Cir. 1992) (internal citations omitted). To prevail on a Section 1983 claim against a municipality, a plaintiff must plead and prove the following: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir. 1983) (citing *Monell*). Absent a showing of a chain of causation between an official policy or custom and the plaintiff's injury, *Monell* prohibits a finding of liability against a municipality. *Id.*

Although Plaintiff has alleged in paragraph 9 of her Complaint that the City of New Haven was "deliberately indifferent in the supervision, training, investigation and discipline of the individual defendants, thus ratifying, promulgating and approving of the constitutional violations," she has not offered one shred of evidence in support of this claim. Indeed, she has not even responded to the City's argument that it has no liability under § 1983. Plaintiff cannot rely on the mere allegations of her complaint. The Court grants summary judgment in favor of the City on Plaintiff's federal § 1983 claim against it.

It is not clear which, if any, of the state-law claims are being asserted against the City. All of Plaintiff's counts simply refer to "Defendants" collectively. Under Connecticut law, a municipality is not vicariously liable for the torts of

its employees under the doctrine of respondeat superior.  *Sanzone v. Board of Police Comm'rs*, 219 Conn. 179, 193 (1991).  While this immunity may be abrogated by statute, no such statute has been cited by Plaintiff.  Therefore, the Court also grants summary judgment in favor of the City on any and all state-law claims asserted against it by Plaintiff.

### Conclusion

Accordingly, for the reasons set forth above, the Court grants summary judgment [Doc. # 43] in favor of the City of New Haven on all counts of Plaintiff's complaint.  The Court grants summary judgment [Doc. # 43] in favor of Defendant Roman on all counts of Plaintiff's complaint except for Count Two, her Section 1983 claim for violation of the Decedent's Fourth Amendment rights.  The Court finds genuine issues of material fact as to whether there was a violation of the Decedent's right to be free from an unreasonable search and likewise finds genuine issues of material fact as to whether Defendant is entitled to qualified immunity.  For the same reasons, the Court grants Defendant Natale's Motion for Summary Judgment [Doc. # 39] as to all counts except Plaintiff's Count Two.

SO ORDERED, this ____14th__ day of __May___, 2008, at Bridgeport, Connecticut.

> ___/s/ *William I. Garfinkel*___
> WILLIAM I. GARFINKEL,
> United States Magistrate Judge